UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1)  VICTORIA ARENA,**<br>**Individually and as next of kin of**<br>**I.R.A, a deceased minor,**<br><br>             **Plaintiff,**<br><br>      **v.**<br><br>**(1)  TOYOTA MOTOR**<br>**CORPORATION, a foreign corporation,**<br>**(2)  TOYOTA MOTOR SALES U.S.A.,**<br>**INC., a Texas Corporation, and**<br>**(3)  GRACO CHILDREN'S**<br>**PRODUCTS, INC., a Delaware**<br>**corporation,**<br><br>             **Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. CIV-24-1248-JD** |

**DEFENDANT GRACO CHILDREN'S PRODUCTS INC.'S**
**RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE**
**OPINIONS OF DR. MARK SOCHOR, M.D., M.S.**

Defendant Graco Children's Products Inc., ("Graco") files this response in opposition to Plaintiff's Motion to Exclude the Opinions of Dr. Mark Sochor, M.D., M.S., ECF No. 71, and in further opposition thereto, states as follows:

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff's motion seeks exclusion on two grounds: (1) untimely disclosure under Rule 37(c)(1), and (2) purported unreliability under Rule 702 and Daubert. Neither ground warrants exclusion.

The disclosure issue is straightforward: Dr. Sochor's finalized report was transmitted to Graco's counsel on the April 3, 2026, deadline, was placed on ArentFox

1

Schiff's internal drive that same day and was simultaneously uploaded to the Kiteworks secure file-transfer platform along with all other expert folders for transmittal to all parties. Due to an apparent, yet inadvertent, technological failure in the Kiteworks system—not any deliberate strategy—Dr. Sochor's report (and only Dr. Sochor's report) did not upload completely. The error was corrected within minutes of notification on April 6, 2026. That is not "subterfuge." It is an innocuous technical glitch that caused no prejudice to any party. Dr. Sochor has not yet been deposed, trial is not imminent, and Plaintiff has had the report for over seven weeks as of the date of this filing.

Plaintiff's Rule 702 arguments are equally meritless—and their rhetorical centerpiece, the "compressed crash pulse" argument, is built on a factual premise that is demonstrably false. Plaintiff asserts that the sled pulse delivered the crash's total velocity change in "approximately 81.5 milliseconds—roughly half the 170-millisecond duration recorded by the Corolla's own Event Data Recorder." But the EDR's 170-millisecond recording window is not the duration of the crash pulse. It is the duration of the EDR's recording capability. The actual deceleration—the period during which the vehicle's change in velocity is actively occurring—is substantially complete well before 170 milliseconds. The crash pulse used in the sled test, with deceleration forces substantially complete by approximately 81 milliseconds, is consistent with Mr. Bare's reconstruction of the actual crash dynamics. Moreover, Dr. Maltese has confirmed that the sled pulse and Mr. Bare's simulated crash pulse are an identical match through all relevant portions of the crash event, and that the critical injury metric—upper neck axial forces—achieved its maximum well before 80 milliseconds. Plaintiff's entire "duration-corrected"

2

mathematical analysis—which purports to reduce the 1,346-Newton measurement to 646 Newtons—is predicated on an obvious and inescapable error: treating the EDR's 170-millisecond recording window as the crash pulse duration.

The reliability of this sled pulse is independently corroborated by a second, entirely separate set of testing in this litigation. Toyota's experts conducted their own sled testing using the same peak acceleration values that occurred at the same time in the crash pulse, and their results also show upper neck tension values exceeding the applicable IARV at a similar magnitude to Graco's testing.  Two independent teams, using different ATDs and independently generated sled pulses, arrived at the same conclusion: rear-facing restraint would not have prevented fatal neck injury in this crash.

Notably, Plaintiff is not challenging either Eric Bare—the accident reconstructionist whose HVE/SIMON simulation generated the crash pulse—or the sled pulse utilized by Toyota's experts, which produced the same ultimate conclusion as Graco's test.  Plaintiff accepts that the crash occurred at 48.9 mph delta-V and generated a peak G of approximately 44 Gs.  If Plaintiff does not challenge the reconstruction itself, it cannot challenge Dr. Sochor's reliance on Mr. Bare's reconstruction output as unreliable.

## I.  LEGAL STANDARD

Rule 37(c)(1) provides that exclusion of an expert witness is improper if the failure was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Substantial justification" means "justified to a degree that could satisfy a reasonable person" *Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1227 (10th Cir. 2015) (citation omitted). District

courts are afforded broad discretion to determine harmlessness. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

Rule 702 of the Federal Rule of Evidence provides that expert testimony is admissible where the expert's scientific, technical, or other specialized knowledge will help the trier of fact, the testimony is based on sufficient facts or data, the testimony is the product of reliable principles and methods, and the expert has reliably applied those principles and methods to the facts of the case. The Court's gatekeeping role is to ensure that the expert employs "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Where evidence is based on valid principles, "[c]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . rather than wholesale exclusion under an uncompromising 'general acceptance' standard," are the appropriate means by which evidence based on valid principles may be challenged. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 580 (1993). Courts within the Tenth Circuit routinely hold that "[q]uestions related to the bases and sources of an expert's opinion affect the weight to be assigned to that opinion, rather than its admissibility." *Rimes v. MVT Svcs., LLC*, 2020 WL 8617211, *3 (N.D. Okla. Aug. 25, 2020), quoting *Cohen v. Lockwood*, 02-2246-JPO, 2004 WL 763961, *2 (D. Kan. April 4, 2004); *see also* Willis v. Oklahoma Co. Detention Ctr., CV-18-323-D, 2022 WL 989429, *4 (W.D. Okla. Jan. 5. 2022) ("the factual basis and sources of an expert's opinion affect the weight to be assigned to that opinion rather than its admissibility." (quotations omitted).

4

## II.    ARGUMENT

### A.    Graco's Disclosure Was Substantially Justified and Harmless, and Exclusion Under Rule 37(c)(1) is Improper.

On April 3, 2026, the court-ordered expert report deadline, Dr. Mark Sochor's office transmitted his expert report to ArentFox Schiff. *See* Bryan Decl. at ¶ 3, attached hereto as Exhibit A; Ex. 1 to Bryan Decl.  That same day, the report was placed in Dr. Sochor's expert folder on ArentFox Schiff's internal R-drive. *See* Ex. A at ¶ 4; Ex. 2 to Bryan Decl. Also on April 3, 2026, Ms. Bryan, one of Graco's counsel with ArentFox Schiff, simultaneously uploaded all four of Graco's expert folders—including the folder containing Dr. Sochor's report—to Kiteworks, ArentFox Schiff's secure ShareFile site. *See* Ex. A at ¶ 5; Ex. 3 to Bryan Decl.  That same day, Graco's counsel transmitted an email with the expert disclosure list and the Kiteworks link to Graco's expert folders to all parties. *See* Transmittal Email, attached as Exhibit B. The expert disclosure list explicitly stated that Dr. Sochor was a disclosed expert that stated, "[a] copy of Dr. Sochor's CV and report are being produced with this disclosure. Dr. Sochor's availability for deposition has been provided." *Id.*

Ms. Bryan did not receive an error message on the Kiteworks site and reasonably believed that all folders had been uploaded completely.  *See* Exhibit A at ¶ 6.  Ms. Bryan was not made aware of the inadvertent failure to upload Dr. Sochor's expert report until Toyota's counsel e-mailed her on April 6, 2026, at 9:24 a.m. to let her know she was not seeing the report. *See* Ex. A at ¶ 7; Ex. 4 to Bryan Decl.  Ms. Bryan immediately re-uploaded the report upon learning of the issue. *Id.*

5

Plaintiff's characterization of Graco's conduct as "willful" and "subterfuge" is disproved by the undisputed facts. The facts show that the failure to upload Dr. Sochor's report was inadvertent—the product of a technological failure in the Kiteworks file-transfer system, not a deliberate strategy to conceal the report from Plaintiff's counsel. *See* Ex. A.

The Tenth Circuit evaluates four factors to determine whether a disclosure violation warrants exclusion. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985 (1999). Each of those factors confirms that exclusion here is unwarranted:

**1. Prejudice or Surprise.** Plaintiff had prior notice through Graco's Rule 26(a)(2) disclosures that Dr. Sochor had been designated as a retained biomechanical engineering expert and that his report was being produced with the disclosure. Plaintiff was therefore on notice of the substance and subject matter of Dr. Sochor's anticipated testimony. The Tenth Circuit has found insufficient prejudice where the opposing party had prior knowledge of the evidence at issue. *See e.g., Hirpa v. IHC Hosps., Inc.*, 50 F. App'x 928, 932 (10th Cir. 2002) (finding no abuse of discretion where plaintiff knew of the existence of the undisclosed evidence). In *Hirpa*, the court emphasized that where a party has knowledge of evidence and fails to request it, the prejudice from late disclosure is diminished. *Id.* at *934. Here, Plaintiff knew Dr. Sochor's report existed as the designation expressly stated as much.

Moreover, any claim of prejudice based on an inability to file a "focused Daubert challenge" (ECF No. 71 at p. 5) is belied by the record: Plaintiff filed a thirteen-page motion to exclude Dr. Sochor's opinions on the same day the report was received, demonstrating that Plaintiff was able to mount a comprehensive challenge immediately.

Indeed, Plaintiff raises substantially the same arguments against Dr. Sochor as she does against Dr. Maltese—gap configuration, no forward-facing test, and crash pulse concerns—arguments she had been preparing for weeks and which apparently did not require extended study of Dr. Sochor's report to articulate. Additionally, Plaintiff has had the ability to have two of her experts—Ms. Hoffman and Mr. Sicher—prepare and serve rebuttal reports specifically addressing the disclosed opinions of Dr. Sochor, further proving the lack of any prejudice to Plaintiff.

**2. Ability to Cure.** Dr. Sochor has not yet been deposed in this case and is not scheduled to be deposed until mid-July. As such, any prejudice claimed by Plaintiff is misguided. By the time Dr. Sochor is deposed, Plaintiff will have had his report for over three months and has already had her experts prepare and serve rebuttal reports specifically addressing Dr. Sochor's opinions. There is no question that Plaintiff will have had ample opportunity to prepare to cross-examine Dr. Sochor on his opinions.

**3. Trial Disruption.** Trial is not scheduled or imminent. No argument can be made that the three-day delay in producing Dr. Sochor's report disrupted the trial setting. In contrast, excluding his testimony entirely would deprive the jury of critical biomechanical evidence on the central causation question in this case.

**4. Bad Faith or Willfulness.** There is no evidence of bad faith or willfulness. The evidence establishes that the failure was inadvertent—all four expert folders were uploaded simultaneously on April 3, 2026, and Graco's counsel received no error message indicating the upload was somehow corrupted. The report was uploaded immediately upon being notified that there had been a technological issue. Here, the undisputed evidence

demonstrates that this was nothing more than an inadvertent technological failure, not a strategic concealment.

The absence of willfulness is dispositive. Unlike the scenario Plaintiff paints, the record shows Graco attempted to upload the report on the deadline date, believed the upload succeeded, and corrected the error within minutes of being notified. This is precisely the type of inadvertent, harmless failure that Rule 37(c)(1) accommodates.

**B.     DR. SOCHOR'S OPINIONS ARE RELIABLE AND ADMISSIBLE UNDER RULE 702.**

Dr. Sochor is a faculty member at the University of Virginia Department of Emergency Medicine, with a secondary appointment as Associate Professor at the Center for Applied Biomechanics within the Department of Mechanical and Aerospace Engineering. He holds both Bachelor and Master of Science degrees in Mechanical Engineering with an emphasis in biomechanics, as well as a Doctor of Medicine degree with board certification in Emergency Medicine. He has studied biomechanics for 25 years, currently serves as Medical Director of the UVA Center for Applied Biomechanics, and has authored over 120 medical and technical publications.

Plaintiff raises three challenges to Dr. Sochor's methodology, none of which warrant exclusion.  Each amount to a disagreement with factual inputs—not methodology—and is properly explored through cross-examination.

**1.  The Distance Between the Rear-Facing Car Seat and the Front Passenger Seat Was Based on Case Specific Evidence.**

Plaintiff argues that the sled test should have been conducted with no gap between the child restraint and the front seatback, and that Dr. Sochor's own test photographs

confirm a "significant gap" that "drove the 99% result." ECF No. 71 at 7. This argument fails for the same reasons set forth in Graco's opposition to Plaintiff's motion to exclude certain opinions of Dr. Maltese, which Graco incorporates by reference here.

In brief: The gap was not arbitrary. Dr. Sochor, together with Dr. Maltese, derived the front passenger seat position from case-specific evidence through a multi-step process. First, a pre-incident photograph taken by Ms. Arena on the day of the crash depicts the position of the front passenger seat in relation to the vehicle's B-pillar and the driver's seat. *See* Matthew Maltese Declaration, Attached as Exhibit C at ¶ 3. Second, Drs. Sochor and Maltese conducted a live surrogate study using a woman of similar height and weight as Plaintiff and a child of similar height and weight as I.A. in an exemplar Toyota Corolla, iteratively adjusting the front seat tracks and seatbacks to align with the pre-incident photograph. *Id.* Third, once the front seating positions were established, the child restraint was simply installed properly in a rear-facing orientation. No "mental rotation" was required.

This physical reconstruction methodology squarely satisfies Rule 702. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004) (finding that the expert's methodology in deducing the likely cause of the explosion was reliable because it was based on his experience as a fire investigator and examination of the physical evidence). Plaintiff's "properly warned parent" argument—that the gap would not have existed if Graco had provided different warnings—is a merits argument about liability, not an admissibility challenge to Dr. Sochor's methodology.

### 2. A Comparative Forward-Facing Test Was Conducted: The Subject Crash is the Baseline.

It is undisputed that I.A. was positioned forward-facing at the time of the subject crash and died from the injuries sustained. The baseline was established on April 21, 2024, when this tragic accident occurred. A forward-facing sled test would do nothing more than confirm what the parties already know: a child sitting forward-facing and subjected to the forces present in this crash sustained fatal cervical injuries.

Plaintiff's experts contend that had I.A. been positioned rear-facing, she would not have sustained fatal injuries. That is Plaintiff's affirmative theory—and Plaintiff's experts did not conduct any case-specific crash or sled testing at comparable crash parameters to validate it. The rear-facing sled test was performed to evaluate whether Plaintiff's untested theory withstands scientific scrutiny. Dr. Sochor's opinion that the rear-facing configuration would also have produced fatal neck forces at this crash severity directly rebuts Plaintiff's causation theory. He was not required to independently confirm what is already established by the undisputed facts.

### 3. The Sled Pulse was Performed at the Same Peak Accelerations as the Subject Crash and Plaintiff's "Compressed Duration" Argument is Factually Inaccurate.

Plaintiff's most aggressive argument—and the one on which her mathematical "correction" table depends (ECF No. 71 at p. 11)—is that the sled pulse "compresses the actual collision into half its real duration." See ECF No. 71 at p. 2. Plaintiff asserts that the Corolla's EDR recorded a crash duration of 170 milliseconds, while the sled delivered its full delta-V in approximately 81.5 milliseconds, and concludes that the sled was

"producing average decelerations 2.08 times higher than the actual collision."  ECF No. 71 at p. 9-10.  Based on this arithmetic, Plaintiff constructs an elaborate "duration-corrected" analysis purporting to reduce the 1,346-Newton neck tension to 646 Newtons and the 99% injury probability to 0.015%.  *Id.*

The premise of this argument is factually wrong.  The 170-millisecond figure Plaintiff relies upon is the recording window of the EDR—the total time over which the device captures data—not the duration of the crash pulse itself.  See Eric Bare Decl. at ¶ 5, attached as Exhibit D.  As Mr. Bare explains in his Declaration, although the EDR records through 170 milliseconds, "the actual crash pulse—the period during which the vehicle's change in velocity is actively occurring—is substantially complete well before that time."  *Id.*

As Mr. Bare explained, the EDR data itself cannot be utilized to generate a crash pulse suitable for a sled test, as it does not directly report the acceleration pulse over time that is needed for this type of sled testing.  *Id.* at ¶ 9.  As a result, Mr. Bare utilized the available EDR data to generate an HVE/SIMON simulation that was, in turn, used to create a crash pulse suitable for sled testing.  Mr. Bare has affirmed that the simulated pulse is a close match to the acceleration pulse he generated from his HVE/SIMON simulation and that it achieved peak G measurements consistent with his reconstruction.  *Id.* at ¶ 14.  In other words, the sled pulse is consistent with the actual crash dynamics as reconstructed from the physical evidence.

Dr. Maltese independently confirms the sled pulse's accuracy. Dr. Maltese has prepared a chart overlaying Mr. Bare's simulated crash pulse curve and the resulting sled pulse, which demonstrates that they are "an identical match through all relevant portions of the crash pulse." Ex. C at ¶ 8. Critically, "the critical injury metric—upper neck axial forces . . . achieved its maximum well before 80 milliseconds in the sled testing." *Id.* Any marginal differences in pulse shape after that 80-millisecond point are therefore "irrelevant to the ultimate question being assessed: whether a child in a rear-facing child restraint would be subjected to severe or fatal upper neck forces in this crash." *Id.* "That question had been answered in the affirmative by 80 milliseconds. Whatever happens after that does not and cannot change the answer to that question." *Id.*

Toyota's independent testing corroborates the result. The reliability of the sled pulse and its conclusions is independently validated by a second set of testing in this litigation. Dr. Maltese has reviewed the sled testing performed on behalf of Toyota by Dr. Duran, Dr. Raphael, and Dr. Van Arsdell, and confirms that Toyota's testing—which utilized a 3-year-old ATD—also showed upper neck tension values exceeding the applicable IARV at a similar magnitude. Ex. C at ¶ 9. Toyota's sled pulse "had the same peak acceleration values—which occurred at the same time in the crash pulse—as Graco's testing, further validating the reliability of both tests." *Id.* Although the two sled pulses had different shapes, the primary difference is that Graco's pulse showed slightly *lower* forces at the tail end of the pulse after maximum IARV values had already been achieved. As a result, Graco's test is, if anything, the more conservative of the two.

Plaintiff is not challenging the sled pulse utilized by Toyota, which resulted in the same conclusion as the pulse utilized in Graco's testing. Two independent expert teams, using different ATDs and independently derived sled pulses, arrived at the same result: rear-facing restraint in this crash would have produced neck forces exceeding fatal thresholds.  Indeed, they generated the same peak G measurements at the same time in the crash pulse, further validating each independent result.

Plaintiff's entire mathematical framework—the "duration-corrected" analysis, the scaling ratios, the 646-Newton figure, the 0.015% probability, and the summary table at the conclusion of Plaintiff's motion—collapses once the factual predicate is corrected. The sled pulse was not twice as fast as the actual crash. The sled pulse was the actual crash, as faithfully reconstructed from the EDR data and physical evidence by Mr. Bare.

Critically, Plaintiff has not moved to exclude Mr. Bare or his crash reconstruction. Plaintiff does not challenge the validity of the HVE/SIMON methodology, does not contest the reconstruction's 2% delta-V accuracy, and does not argue that Mr. Bare's pulse derivation was unreliable. Nor is Plaintiff pursuing any objection to the sled pulse used by Toyota's experts, which produced the same peak G measurements and resulted in an identical conclusion to Graco's tests.  If the reconstruction is accepted—as Plaintiff's silence on it establishes—then the crash pulse utilized for the sled test relied upon by Drs. Maltese and Sochor is accepted as well. An expert who relies on a validated crash reconstruction provided by a qualified reconstructionist has not committed a methodological failure by using that reconstruction as an input to his testing. To the contrary, that is precisely what experts in the field are supposed to do.

13

The shape of the crash pulse Mr. Bare generated is constrained by multiple independent inputs: "the known pre-impact speeds of both vehicles, the physical damage profiles, the post-impact movement patterns, and the EDR delta-V curve itself." Ex. D at ¶ 12. Mr. Bare's simulation was not generated in a vacuum—it was bounded by the data recorded in the EDR. *Id.* To the extent Plaintiff contends that the sled pulse should have been shaped differently or delivered over a longer duration, that is a disagreement about factual inputs properly explored through cross-examination—not a basis for excluding Dr. Sochor's testimony. *See Daubert*, 509 U.S. at 596.

## III.    Conclusion

For the foregoing reasons, Plaintiff's motion should be denied.

The disclosure delay was inadvertent—the product of a technological failure in a file-transfer system, not a deliberate strategy. It was corrected within minutes of notification, has caused no prejudice, and is harmless under the *Woodworker's Supply* factors.

Dr. Sochor's opinions rest on well-established biomechanical methodology and satisfy the requirements of Rule 702 and Daubert. He configured his test based on the same surrogate study and photographic evidence used by Dr. Maltese, used a crash pulse derived from a validated reconstruction that Plaintiff does not challenge, and applied peer-reviewed injury risk curves to measured results. Plaintiff's most dramatic argument—that the sled pulse was "twice as fast" as the actual crash—is factually incorrect: the EDR data itself confirms that the actual crash deceleration was substantially complete well before the 170-millisecond recording window Plaintiff mischaracterizes as the crash duration; Dr.

14

Maltese's overlay chart demonstrates that the sled pulse and crash pulse are an identical match through all relevant portions; and Toyota's independent testing using the same peak acceleration values produced the same result, independently corroborating the reliability of the pulse.

Plaintiff's remaining disagreements—about gap configuration and the absence of a forward-facing comparison test—are the same arguments Plaintiff raises against Dr. Maltese and are equally unavailing here. Each goes to the weight of Dr. Sochor's testimony, not its admissibility, and is properly addressed through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

Submitted this 29th day of May 2026.

Respectfully submitted,

/s/ Steve M. Copenhaver

Cary E. Hiltgen OBA# 4219
J.R. "Randy" Baker OBA# 452
Hiltgen & Brewer, P.C.
9505 North Kelley Avenue
Oklahoma City, OK 73131
Telephone (405) 605-9000
Facsimile (405) 605-9010
E-mail:  chiltgen@hbokc.law
         rbaker@hbokc.law

Malerie Ma Roddy (pro hac vice)
Rachael A. Bryan (pro hac vice)

15

Stephen M. Copenhaver (pro hac vice)
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone (312) 258-5500
Facsimile (312) 258-5600
E-mail:  malerie.roddy@afslaw.com
            rachael.bryan@afslaw.com
            steve.copenhaver@afslaw.com

***Attorneys for Defendant, Graco
Children's Products, Inc., a Delaware
corporation***

16

**CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2026, I filed the attached document with the Clerk

of Court, and all Counsel of Record were served via the Court's ECF system.


Respectfully submitted,



/s/ Rachael A. Bryan

17